# STATE OF MICHIGAN

# COURT OF APPEALS

---

MICHAEL ALAN SCHWARTZ,

      Plaintiff/Counter-Defendant-
      Appellant,

v

SARA OLTARZ-SCHWARTZ,

      Defendant/Counter-Plaintiff-
      Appellee.

UNPUBLISHED
September 22, 2016

Nos. 324555; 330031; 330213
Oakland Circuit Court
LC No. 2013-810233-DO

---

Before: BORRELLO, P.J., and MARKEY and RIORDAN, JJ.

PER CURIAM.

In these consolidated appeals, plaintiff appeals as of right in Docket No. 324555 a judgment of divorce entered by Oakland Circuit Court Judge Mary Ellen Brennan. In Docket No. 330031, plaintiff appeals as of right a subsequent order entered by Judge Lisa Langton, which required plaintiff to pay defendant $68,452.60 in attorney fees and $3,965 in costs related to the divorce. In Docket No. 330213, plaintiff appeals by leave granted another order entered by Judge Langton, which granted in part defendant's motion to enforce the judgment of divorce. In Docket No. 330031, we vacate the order awarding attorney fees and remand for further proceedings, but affirm in all other respects.

## I. FACTUAL BACKGROUND

Plaintiff and defendant, both attorneys, were married on December 8, 1973. The marriage produced two children who were adults at the time of the divorce.

In the early 2000s, plaintiff lost approximately $1 million in investments when the stock market crashed. The parties agreed at trial that the initial collapse of their marriage coincided with the loss. However, they also provided extensive testimony regarding their respective perspectives on the subsequent breakdown of their relationship, including the fact that the couple stopped sharing a marital relationship at least 10 years prior to trial. At some point, plaintiff began engaging in a long-term affair with Julie Mareski, whom he secretly supported financially for several years prior to the divorce.

In December 2012 or January 2013, plaintiff disclosed the affair and his support of Mareski to defendant. A short time later, defendant requested a divorce, and plaintiff moved out.

-1-

According to defendant, plaintiff asked her to hold off filing for divorce, promising that a title company he operated would start earning "a lot more money" and that he would pay all the legal fees in an "amicable divorce." Regardless, plaintiff filed a divorce complaint on July 8, 2013.

Extensive proceedings ensued. Ultimately, the trial court entered an opinion and order granting the divorce on August 29, 2014. After additional filings and hearings, the trial court entered a judgment of divorce and uniform spousal support order on October 1, 2014.[1] Further proceedings related to the divorce continued for nearly a year afterward, eventually resulting in the trial court's September 9, 2015 order awarding defendant $68,745.10 in attorney fees and $3,965 in costs and its September 18, 2015 order granting in part defendant's motion to enforce the judgment of divorce, as well as other opinions and orders.

## II. PROPERTY DIVISION

In Docket No. 324555, plaintiff raises numerous challenges to the trial court's division of the parties' property. We reject all of plaintiff's claims.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

Appellate courts review a trial court's dispositional ruling in a divorce case as follows:

The appellate court must first review the trial court's findings of fact under the clearly erroneous standard. If the findings of fact are upheld, the appellate court must decide whether the dispositive ruling was fair and equitable in light of those facts. But because we recognize that the dispositional ruling is an exercise of discretion and that appellate courts are often reluctant to reverse such rulings, we hold that the ruling should be affirmed unless the appellate court is left with the firm conviction that the division was inequitable. [*Sparks v Sparks*, 440 Mich 141, 151-152; 485 NW2d 893 (1992) (footnote omitted).]

"The goal in distributing marital assets in a divorce proceeding is to reach an equitable distribution of property in light of all the circumstances." *Gates v Gates*, 256 Mich App 420, 423; 664 NW2d 231 (2003). "The division need not be mathematically equal, but any significant departure from congruence must be clearly explained by the trial court." *Id*. When dividing the marital estate, it is appropriate for the court to consider the following non-exhaustive factors:

(1) duration of the marriage, (2) contributions of the parties to the marital estate, (3) age of the parties, (4) health of the parties, (5) life status of the parties, (6) necessities and circumstances of the parties, (7) earning abilities of the parties, (8) past relations and conduct of the parties, and (9) general principles of equity.

---

[1] On November 4, 2014, the trial court filed a judgment *nunc pro tunc* to include page three of the judgment, which had not been filed electronically or sent to the parties. The effective date of the judgment was still October 1, 2014.

[*Sparks*, 440 Mich at 159-160.]

"[W]here any of the factors . . . are relevant to the value of the property or to the needs of the parties, the trial court shall make specific findings of fact regarding those factors." *Id*. at 159. "The significance of each of these factors will vary from case to case, and each factor need not be given equal weight where the circumstances dictate otherwise." *Byington v Byington*, 224 Mich App 103, 115; 568 NW2d 141 (1997). "Indeed, there will be many cases where some, or even most, of the factors will be irrelevant." *Sparks*, 440 Mich at 159.

## B. *SPARKS* FACTORS

Plaintiff first raises a series of claims concerning the trial court's application of the *Sparks* factors. He primarily contends that the court placed a disproportionate emphasis on his fault in the breakdown of the marriage, raising a series of challenges to the trial court's findings or purported lack of findings with regard to each of the factors. As demonstrated below, the record shows that the trial court made specific findings on the *Sparks* factors and did not focus exclusively on defendant's fault for the end of the marriage in distributing the property. While we recognize that defendant received significantly more property than plaintiff as a result of the trial court's distribution, we cannot conclude that the trial court's decision, which it clearly explained, was unfair and inequitable given the facts of this case. See *Gates*, 256 Mich App at 423; *Sparks*, 440 Mich at 151-152.

## 1. CONTRIBUTIONS TO THE MARITAL ESTATE

Plaintiff first argues that the trial court erred in failing to make any express findings regarding the parties' contributions to the marital estate, and that he should have been credited with contributing most of the marital assets—while defendant contributed "virtually nothing"— in the last 20 years. We disagree.

Contrary to plaintiff's claims, the trial court expressly determined in its factual findings that both plaintiff and defendant are licensed attorneys who worked for significant periods of time during the marriage. The court also specifically found that "the parties agreed that [defendant] would stop working and that decision was ratified by their actions during the marriage," and, later in its opinion, that "[d]efendant raised the parties' children and maintained the marital home," which resulted in "her employment skills and education [growing] obsolete." Thus, although the court did not specifically link these findings to the *Sparks* framework, the court did consider each party's contributions to the marital estate.

Additionally, as the trial court concluded, the parties both worked as licensed attorneys, with exceptions for defendant's childcare-related leave, from 1972 until 1992. It was undisputed that plaintiff did not object when defendant left the workforce in 1992, at which time the parties' children were teenagers and still living at home. As the trial court concluded, the record confirms that defendant contributed to the household, preparing meals and caring for the children until they went to college. It was appropriate for the trial court to consider those household contributions. *Hanaway v Hanaway*, 208 Mich App 278, 293-294; 527 NW2d 792 (1995). Additionally, the couple opened a law firm in 2001, but there was not enough work for both plaintiff and defendant. Nevertheless, the record shows that defendant continued to support

plaintiff professionally by reviewing his written work product and substituting for him in court at least once.

Thus, the trial court correctly concluded that both parties contributed substantially to the marital estate. See *Sparks*, 440 Mich at 151-152.

## 2. HEALTH PROBLEMS

Next, plaintiff argues that the trial court should not have "equalized" the parties' health problems when distributing the marital property. We again conclude that the trial court's factual findings on this factor were not clearly erroneous. See *id*.

In its findings, the trial court acknowledged each party's testimony regarding their health issues. Although it did not specifically address the parties' health in the section of its opinion concerning the division of marital assets, it later stated, in the context of establishing spousal support, that "[defendant] has some health issues as does [p]laintiff." Similarly, in its opinion denying plaintiff's motion for a new trial, it reiterated that it had considered both parties' health, as well as other factors, when it divided the parties' assets.

There is no dispute that plaintiff suffers from various health problems. However, no evidence was presented below indicating that the problems impacted his earning potential.[2] Conversely, defendant testified that one doctor had advised her to stop working many years earlier, and that putting in a full day, like she did during trial, was difficult and required special precautions because of her anemia. She also testified that, while plaintiff was working for Geoffrey Fieger, the parties decided that she would stop working at the recommendation of her doctors because she "was not well enough to work full-time." Because she did not work, defendant only owned a portion of the law firm and her only income was $1,250 per month in social security benefits. Therefore, to the extent that the trial court considered the parties' health—and its effect on their status and earning potential, as clearly relevant in dividing the property and awarding spousal support—weighing this factor in favor of defendant was fair and equitable.

Plaintiff also challenges the trial court's acceptance of defendant's testimony, emphasizing that she did not produce documentary evidence to support her statements. See *Sparks*, 440 Mich at 151-152. We find no basis for concluding that the trial court's findings were clearly erroneous based on the lack of independent documentation. "Because this case was heard as a bench trial, the court was obligated to determine the weight and credibility of the evidence presented." *Wright v Wright*, 279 Mich App 291, 299; 761 NW2d 443 (2008). "We defer to the trial court's credibility determinations given its superior position to make these judgments." *Shann v Shann*, 293 Mich App 302, 305; 809 NW2d 435 (2011).

---

[2] Rather, plaintiff testified that, despite his health, "I've always worked, and it's always been my intention to work." Consistent with his stated intentions, the record confirms that plaintiff continued to work, owned a portion of two businesses, and was eligible for $2,349 per month in social security benefits.

### 3. LIFE STATUS AND EARNING ABILITY

In a related argument, plaintiff contends that the trial court clearly erred when it found in the spousal support section of its opinion that defendant was unable to work. Plaintiff claims that defendant never testified that her legal skills and education were obsolete, citing in support of his claim her membership in the Michigan and New York bar associations and her stated efforts to remain abreast of developments in the law. Plaintiff also contends that there was no medical evidence that defendant was disabled from working, and that her testimony about writing a book and the possibility of a lecture tour undermine such a conclusion. We reject plaintiff's claims.

In making this argument, plaintiff ignores the fact that he conceded to defendant's decision to leave the full-time workforce more than two decades earlier. Although defendant is a member of two bar associations and she testified that she tried to stay informed of legal developments, there is no evidence in the record that she could obtain gainful legal employment. To the contrary, when she attempted to secure legal employment in the early 2000s—after being out of the market for much less time than now—she was completely unsuccessful. In addition, by the time of the divorce, defendant was nearly 70 years old, and her health made full days of activity, such as participating in trials, very difficult. Although defendant testified that she is writing a book and has aspirations of participating in a lecture tour, there is no evidence in the record that these efforts will result in income. Likewise, she specifically testified that she has "had problems that have caused [her] to stop writing for a lengthy period of time." Therefore, in light of defendant's professional history, health, and age, we are not left with a definite and firm conviction that the trial court made a mistake when it found that defendant was unable to work and earn an income. See *Sparks*, 440 Mich at 151-152.

### 4. NECESSITIES AND CIRCUMSTANCES OF THE PARTIES

Plaintiff next argues that the trial court should have weighed the parties' current circumstances in his favor when awarding the marital property. He contends that defendant was awarded a large home with many amenities, while he is "compelled" to live in a more modest apartment with Mareski, which has "far less amenities." Aside from the cost to rent the apartment, plaintiff presented no evidence regarding the unit to establish such a distinction. Moreover, although defendant was awarded the marital home, she was also burdened with the parties' mortgage, on which more than $300,000 was owed. Therefore, we find no basis for concluding that the trial court erred in failing to consider the purported disparity between the "necessities and circumstances" of the parties based on the amenities available at their respective residences, or that the property division was unfair and inequitable on that basis. See *Sparks*, 440 Mich at 151-152.

### 5. PAST RELATIONS AND CONDUCT OF THE PARTIES

Plaintiff also challenges the trial court's findings regarding the fault and conduct of the parties on several grounds. We reject plaintiff's claims.

### *i.* PLAINTIFF'S FAULT IN THE BREAKDOWN OF THE MARRIAGE

Plaintiff argues that the trial court should have apportioned the fault more equally, as he

contends that the breakdown occurred before his long-term affair with Mareski. As plaintiff claims, the trial court acknowledged that both parties "had some responsibility for the breakdown of the marriage." However, the evidence clearly supports the trial court's finding that plaintiff's affair with Mareski and plaintiff's dispersion of the marital assets, through his support of Mareski, were the "overwhelming cause[s]" of the breakdown. Even though both parties admitted that they grew apart in the 1990s or early 2000s and stopped having intimate relations, the parties did not decide to divorce until defendant learned of plaintiff's secret affair with, and financial support of, Mareski.

Additionally, plaintiff contends that the trial court gave disproportionate weight to his fault and punished him for the affair to the exclusion of the other *Sparks* factors. However, as the trial court emphasized in its opinion denying plaintiff's motion for a new trial, it is apparent that the court considered plaintiff's fault—including both the affair and his "economic waste" of the parties' resources by providing for Mareski's expenses for many years—as well as the long length of the marriage; both parties' earning capacity; both parties' contributions to the marriage and family; the age of the parties; and the parties' health.

Relatedly, plaintiff claims in his brief on appeal that the judgment is inequitable because he received only 13 percent of the parties' assets while defendant received 87 percent. Plaintiff's calculations are difficult to follow and seem miscalculated. Adding just the parties' immediate cash resources and equity, and subtracting the parties' debt,[3] plaintiff is left with a positive balance, whereas defendant is left with a negative balance. Notably, these totals do not reflect the future revenue that plaintiff may enjoy from his title company[4] and from attorney fees through his work at the law firm, as well as the thousands of dollars in marital assets that he already—and secretly[5]—dissipated from the marital estate in order to support Mareski during the marriage.[6] "[A] party's attempt to conceal assets" is "relevant in considering an equitable

---

[3] Marital debts are treated in the same way as marital assets in a divorce action. See, e.g., *Butler v Simmons-Butler*, 308 Mich App 195, 208-209; 863 NW2d 677 (2014).

[4] Although the title company is currently unprofitable, he promised defendant that it would earn millions of dollars.

[5] Plaintiff argues that the trial court did not explain how it concluded that there was an effort to conceal assets, but even plaintiff testified that defendant did not know that he was supporting Mareski until December 2012 or January 2013.

[6] The trial court found that, in 2004 and 2005, plaintiff routinely removed $1,500 to $2,000 per month from the law firm's account, and plaintiff admitted that he gave Mareski loans that were not repaid around this time. Likewise, between 2005 and 2013, plaintiff spent $89,900 just on rent for Mareski. And in addition to her rent, plaintiff supported Mareski with payments for her utilities, cable TV, phone, transportation (including the lease, rental, and purchase of a car, insurance costs, registration fees, and license plate fees), gifts, and spending money. Mareski testified that she was "sure there were things that he didn't pay for," but she did not name any. The trial court did not identify plaintiff's total spending in addition to rent, but it stated in its opinion that it amounted to "tens of thousands of dollars."

division of marital property[.]" *Hanaway*, 208 Mich App at 298. Likewise, "when a party has dissipated marital assets without the fault of the other spouse, the value of the dissipated assets may be included in the marital estate." *Woodington v Shokoohi*, 288 Mich App 352, 368; 792 NW2d 63 (2010). Additionally, as previously mentioned, plaintiff has a greater earning capacity than defendant despite his age and health problems.

Again, "[t]he goal in distributing marital assets in a divorce proceeding is to reach an equitable distribution of property in light of all the circumstances." *Gates*, 256 Mich App at 423. The application of the *Sparks* factors in this case supports the trial court's property distribution. We are not left with a firm conviction that the property division was inequitable. See *Sparks*, 440 Mich at 151-152.

### *ii*. COBRA PAYMENTS

Plaintiff also argues that the trial court clearly erred when it found that he paid for Mareski's insurance through the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), 29 USC 1161 *et seq.*, from August 2013 to November 2013, but did not pay for defendant's COBRA coverage. The testimony and documentary evidence presented at trial shows that plaintiff paid for both Mareski's and defendant's benefits during that period using the firm's account. Thus, as defendant agrees on appeal, the trial court clearly erred in concluding that plaintiff did not pay for defendant's coverage. See *Sparks*, 440 Mich at 151-152.

However, the trial court's error was harmless. See MCR 2.613(A). It made this finding as part of its determination that plaintiff was at fault for dissipating the marital estate by supporting Mareski for years. Given the extensive evidence in the record, the court's error does not affect that determination. Thus, we will not disturb the trial court's judgment based on this minor factual error, as we are not "left with the definite and firm conviction that a mistake has been made." See *Draggoo v Draggoo*, 223 Mich App 415, 429; 566 NW2d 642 (1997).

### *iii*. VETERINARY EXPENSES

Plaintiff contends that the trial court erred in requiring him to reimburse defendant for the family pet's veterinary bills. He first argues that documentary evidence establishes that defendant did not spend $12,000, despite her testimony at trial. Second, he argues that insurance would not have covered all of the costs incurred and, as such, challenges the trial court's finding that he unilaterally decided "not to renew the pet insurance that would have covered those costs." We also reject these claims.

The only evidence regarding the costs of the veterinary care presented at trial was defendant's testimony, which the trial court found credible. Plaintiff testified that pet insurance is a "bad deal," but he did not offer any evidence regarding items a policy would have covered in this circumstance. Again, it was the trial court's responsibility to "determine the weight and credibility of the evidence presented." *Wright*, 279 Mich App at 299. Plaintiff later submitted some unverified receipts for the dog's care (totaling $3,361.30) and sample pet insurance coverage with his motion for a new trial and with his brief on appeal. However, plaintiff did not establish that this was "newly discovered" evidence warranting a new trial. See MCR 2.611(A)(1)(f); *South Macomb Disposal Auth v Am Ins Co*, 243 Mich App 647, 655; 625 NW2d

40 (2000). Likewise, the evidence that plaintiff submitted after the close of proofs with his motion for a new trial, as well as with his brief on appeal, is not part of the evidentiary record that we will consider on appeal. See *In re Rudell Estate*, 286 Mich App 391, 405; 780 NW2d 884 (2009); *Kent Co Aeronautics Bd v Dep't of State Police*, 239 Mich App 563, 579-580; 609 NW2d 593 (2000), aff'd sub nom *Byrne v State*, 463 Mich 652 (2001). As a result, it cannot be used to establish that the trial court clearly erred in making its factual findings regarding the pet bills.

Moreover, even if all of the costs incurred would not have been covered by the pet insurance, defendant testified that plaintiff had promised to pay for the veterinary costs, and the trial court expressly found defendant's testimony credible. Therefore, the order requiring plaintiff to reimburse defendant according to his promise was fair and equitable.

## C. CLASSIFICATION OF PROPERTY

Plaintiff also raises various challenges regarding whether particular types of property were marital or separate. We reject his claims.

## 1. STANDARD OF REVIEW

We review "for clear error a trial court's factual findings on . . . whether a particular asset qualifies as marital or separate property." *Hodge v Parks*, 303 Mich App 552, 554-555; 844 NW2d 189 (2014). Generally, marital assets are subject to division between the parties, but the parties' separate assets may not be invaded. *Woodington*, 288 Mich App at 358. Assets acquired or earned by a spouse during the marriage are usually part of the marital estate. *Cunningham v Cunningham*, 289 Mich App 195, 201; 795 NW2d 826 (2010), citing MCL 552.19. Additionally, separate assets acquired before marriage become part of the marital estate "if they are commingled with marital assets and treated by the parties as marital property." *Id*. (quotation marks and citation omitted). Notably, "[t]he mere fact that property may be held jointly or individually is not necessarily dispositive of whether the property is classified as separate or marital." *Id*. at 201-222. As a result, "[t]he actions and course of conduct taken by the parties are the clearest indicia of whether property is treated or considered as marital, rather than separate, property." *Id*. at 209.

## 2. ANALYSIS

Plaintiff first argues that the trial court made factual misstatements about their management of marital funds and contradictorily concluded that the parties' funds were commingled even though the parties never had joint accounts. We disagree. Even though the parties had separate accounts, the record demonstrates that plaintiff and defendant used the funds in their separate accounts for joint purposes, such as paying marital bills. Even if a party acquired separate property during the marriage, or brought preexisting separate property into the marriage, the court may divide it as part of the marital estate if it is commingled with marital property or used for joint purposes. See, e.g., *Polate v Polate*, 331 Mich 652, 654-655; 50

NW2d 190 (1951).[7]  Further, there is a presumption that earned property (*e.g.*, as compensation for services) acquired by one spouse during the marriage is marital property.  *Byington v Byington*, 224 Mich App 103, 112; 568 NW2d 141 (1997).

Additionally, plaintiff claims that the court's finding that the parties "were always signatories on each other's accounts" but no longer signatories after 1995 was a *non sequitur*. We disagree.  Although the trial court's findings could have been drafted with a more careful use of the word "always," the court clearly referred to the historical trend until 1995 and then noted a subsequent change in the parties' practice.

Finally, plaintiff argues that the trial court erroneously awarded a painting—valued between $1,000 and $3,000—to defendant because it was his separate property.  "Normally, property received by a married party as an inheritance, but kept separate from marital property, is deemed to be separate property not subject to distribution."  *Dart v Dart*, 460 Mich 573, 585; 597 NW2d 82 (1999).  However, even though the painting came from plaintiff's family, it was not obtained by inheritance.  Rather, defendant testified that when the parties were first married, plaintiff sought out the painting in order to show it to her, as it featured a Polish scene and she was born in Poland.[8]  After learning that plaintiff's parents gave the painting to plaintiff's brother, and that he was only storing it in a closet, plaintiff and defendant acquired the painting and enjoyed it in their home for the rest of their 40-year marriage together.  Plaintiff does not cite any evidence indicating that the painting was intended to be his separate property.  See *Cunningham*, 289 Mich App at 209.  Thus, the trial court did not err in concluding that the painting was marital property or abuse its discretion in distributing it to defendant as it divided the parties' assets.  See *Hodge*, 303 Mich App at 554-555.

### III.  LIQUIDATION OF EXISTING LIFE INSURANCE POLICIES AND PURCHASE OF NEW POLICIES

### A.  STANDARD OF REVIEW AND APPLICABLE LAW

We review a trial court's award of spousal support for an abuse of discretion and its findings of fact related to a spousal support award for clear error.  *Woodington*, 288 Mich App at 355.  We will affirm a trial court's dispositional ruling unless we are left with the firm conviction that the ruling was inequitable.  *Id.*  "The objective of spousal support is to balance the incomes

---

[7] In a reply brief, plaintiff also argues that an inheritance from his mother should have been treated as separate property.  Reply briefs are limited to rebuttal, and raising an issue for the first time in a reply brief is not sufficient to present the matter for appeal.  *Bronson Methodist Hosp v Michigan Assigned Claims Facility*, 298 Mich App 192, 199; 826 NW2d 197 (2012). Nevertheless, we note that by the time the judgment was entered, there was nothing left from the inheritance to distribute.  Plaintiff already had spent the money, and he admitted that it was used to pay the parties' bills.

[8] Accordingly, defendant testified that if she had not been born in Poland, "we probably wouldn't even have the painting[.]"

and needs of the parties in a way that will not impoverish either party, and support is to be based on what is just and reasonable under the circumstances of the case." *Id*. at 356.

## B. ANALYSIS

In Docket No. 324555, plaintiff argues that Judge Brennan's order to obtain life insurance to insure his monthly $1,800 spousal support obligation in the event of his death is inequitable.[9] We disagree.

Without any citation to the record or substantiation in his brief, plaintiff makes contradictory claims that (1) he is uninsurable because of his health problems, and (2) he can only obtain a whole life policy "at an expensive premium for a mere fraction of the coverage which is necessitated by the order." Nevertheless, given plaintiff's health problems, including, among other things, diabetes and heart disease—and given the fact that defendant's entitlement to spousal support survives plaintiff's death and terminates only upon defendant's death or remarriage—it was not inequitable, in order to ensure compliance with the judgment, for the trial court to require plaintiff to secure his spousal support obligation by purchasing a life insurance policy.[10] See *Woodington*, 288 Mich App at 355.

Additionally, in Docket Nos. 324555 and 330213, plaintiff raises nearly identical claims that Judge Brennan's order requiring plaintiff to liquidate his existing life insurance policies and purchase new, more expensive policies was nonsensical. Plaintiff's argument is unpersuasive for several reasons. First, in the trial court, plaintiff expressly requested that the existing life insurance policies be liquidated and divided equally between the parties, just as Judge Brennan ultimately ordered. He cannot now complain that he received that requested relief.[11] See

---

[9] Notably, plaintiff does not contest the award itself or the factors considered by the trial court in awarding spousal support. He only contests the court's order that he insure his monthly spousal support obligation.

[10] See *Luckow v Luckow*, 291 Mich App 417, 425; 805 NW2d 453 (2011) (recognizing that under Michigan law, "the obligation to pay alimony does not terminate by operation of law upon the death of the payor; it may be enforced against the payor's estate") (quotation marks and citation omitted); *Kurz v Kurz*, 178 Mich App 284, 296-297; 443 NW2d 782 (1989) (concluding that a trial court "abused its discretion in requiring [the plaintiff] to maintain a life insurance policy naming [the] defendant as sole beneficiary so as to secure her right to alimony" because "[u]nder the terms of the divorce judgment, [the] plaintiff's obligation to pay alimony ceased upon the occasion of his death."). Cf. *Luckow*, 291 Mich App at 425-426 ("To hold that, as a rule, the death of the payor eliminates any further spousal-support obligation without regard to the particular circumstances pertinent to an award of spousal support *would alter the balance of assets and income struck by the court* in rendering the divorce judgment and any subsequent modification orders, without regard to the provisions of the divorce judgment or to the particular equities presented.") (emphasis added).

[11] Plaintiff asserts on appeal that he requested that only one policy be liquidated and defendant's policy be kept intact, but he provides no citation to the record in support of this claim.

*Hoffenblum v Hoffenblum*, 308 Mich App 102, 117; 863 NW2d 352 (2014). Second, by liquidating the existing insurance policies, the parties each received approximately $74,000, thereby providing a large cash reserve that, as clear from the record, both parties needed, partially because of plaintiff's dissipation of marital assets. Third, even if Judge Brennan knew, as plaintiff argues, that the new insurance policy would be expensive for plaintiff, any monthly payment for life insurance for the remainder of defendant's life was much lower than the cash reserve plaintiff obtained from liquidating the existing policies.

We reject plaintiff's claims.

## IV. JUDICIAL BIAS

Throughout his brief on appeal in Docket No. 324555, plaintiff suggests that the trial court was biased against him in light of statements that the court made throughout the proceedings concerning plaintiff's testimony and conduct. Because he failed to include an issue related to judicial bias in his statement of questions presented and failed to cite any supporting authority in support of this claim, we deem this issue waived and abandoned. See *River Investment Group, LLC v Casab*, 289 Mich App 353, 360; 797 NW2d 1 (2010); *Houghton ex rel Johnson v Keller*, 256 Mich App 336, 339-340; 662 NW2d 854 (2003). Nevertheless, we note that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings . . . do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Cain v Michigan Dep't of Corrections*, 451 Mich 470, 496; 548 NW2d 210 (1996). We find no indication in the record that such was the case here.

## V. ATTORNEY FEES & COSTS

Next, in Docket Nos. 324555 and 330031, plaintiff challenges Judge Brennan's orders concluding that defendant was entitled to attorney fees and costs and Judge Langton's order determining the amount of fees and costs owed. We agree that remand is required with regard to this issue.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

> We review for an abuse of discretion a trial court's award of attorney fees in a divorce action. An abuse of discretion occurs when the result falls outside the range of principled outcomes. However, findings of fact on which the trial court bases an award of attorney fees are reviewed for clear error. A finding is clearly erroneous if we are left with a definite and firm conviction that a mistake has been made. [*Richards v Richards*, 310 Mich App 683, 699-700; 874 NW2d 704 (2015) (quotation marks and citations omitted).]

Under the "American rule," attorney fees are not recoverable as an element of costs or damages unless expressly allowed by statute, court rule, common-law exception, or contract. *Reed v Reed*, 265 Mich App 131, 164; 693 NW2d 825 (2005). Likewise, in divorce actions, attorney fees are not recoverable by right, but they are authorized by statute, see MCL 552.13, and court rule, see MCR 3.206(C). *Reed*, 265 Mich App at 164. However, there is a "common-law exception to the American rule that an award of legal fees is authorized where the party

requesting payment of the fees has been forced to incur them as a result of the other party's unreasonable conduct in the course of the litigation." *Reed*, 265 Mich App at 164-165 (quotation marks and citation omitted). See also *Richards*, 310 Mich App at 700. In order to fulfill the exception, "the attorney fees awarded must have been incurred because of misconduct." *Reed*, 265 Mich App at 165. "The party requesting the attorney fees has the burden of showing facts sufficient to justify the award." *Borowsky v Borowsky*, 273 Mich App 666, 687; 733 NW2d 71 (2007).

## B. ANALYSIS

As an initial matter, it is necessary to clarify the basis of Judge Brennan's grants of attorney fees in this case. In her August 29, 2014 opinion and order granting the divorce, she noted that defendant had requested attorney fees under MCR 2.313(A)(5) because (1) plaintiff's testimony was not credible, and (2) plaintiff insufficiently answered a request for admission, claiming that a loan and inheritance paid for most of Mareski's expenses, and this answer greatly increased the costs and expenses incurred by defendant. Judge Brennan then concluded:

> The court is satisfied that because the testimony at trial established that [p]laintiff has been fully supporting Ms. Mareski since at least 2004, years before the 2009 $50,000 loan from Geoffrey Fieger and the $150,000 2010 inheritance from his mother, an award of fees and costs shall be awarded to [d]efendant. The court will hold a hearing to determine the amount.

The opinion also states, "A Judgment shall enter *in conformance with this Opinion and Order* within fourteen (14) days of its issuance." (Emphasis added). The October 1, 2014 judgment of divorce states, "Defendant is awarded attorney fees incurred on Defendant's behalf. This Court will schedule an evidentiary hearing to determine the amount."

Consistent with Judge Brennan's August 29, 2014 opinion and order, Judge Langton held a hearing on the attorney fee issue on July 31, 2015. She then entered a blanket award of attorney fees and costs in her September 9, 2015 order, reasoning:

> Even though Plaintiff argues that Judge Brennan awarded limited attorney fees solely as a sanction for discovery deficiencies, the court does not agree, and does not find Judge Brennan's award to be so narrow. It is true that in the *Opinion and Order*, the attorney fee award was in response to Defendant's request under MCR 2.313(A)(5). The court, however, finds that the Judgment of Divorce – which was issued at a later date – simply awarded Defendant attorney fees, without any restrictive language. Furthermore, Judge Brennan also awarded Defendant "actual attorney fees and costs in connection with this matter," two weeks after the parties entered their Judgment of Divorce, in connection to a motion seeking to supplement the parties' initial Judgment of Divorce. This further demonstrates to the court Judge Brennan's intention for a more wide ranging attorney fee award, than what Plaintiff argues she granted.

We disagree with Judge Langton's conclusion. See *Neville v Neville*, 295 Mich App 460, 466; 812 NW2d 816 (2012) (stating that we review a trial court's interpretation of a divorce

-12-

judgment *de novo*). Again, Judge Brennan's opinion and order granting the divorce provided that a judgment would be entered "in conformance with" that opinion. Even though Judge Brennan did not restate the basis of her attorney fee award in the judgment, we must assume, given the clear language of her opinion and order—and the fact that there is nothing in the record indicating that Judge Brennan later intended to expand the scope of the attorney fees awarded in that opinion—that the award of attorney fees in the judgment was "in conformance" with the opinion's limitation of attorney fees to those necessitated by the request to admit.[12] Thus, we conclude that Judge Langton clearly erred in concluding that Judge Brennan's judgment intended a "more wide ranging attorney fee award." See *Richards*, 310 Mich App at 699-700.

## 1. ATTORNEY FEES RELATED TO REQUEST TO ADMIT

Next, given plaintiff's challenges to the basis of the attorney fee award in the August 29, 2014 opinion and order, we must determine whether the trial court's award of attorney fees necessitated by the request to admit constituted an abuse of discretion. As mentioned *supra*, Judge Brennan noted in her opinion that defendant sought fees under MCR 2.313(A)(5), but that court rule is not applicable to the circumstances here.[13] Additionally, defendant did not request attorney fees on the basis of need pursuant to MCL 552.13 or MCR 3.206(C)(2), and there is no indication in the record that Judge Brennan justified the award with that statute or court rule.

Plaintiff argues that one of the bases on which Judge Brennan predicated the award was MCR 2.313(C) in light of plaintiff's response to defendant's request to admit. He contends that granting attorney fees on that basis was in error. MCR 2.313(C) provides, in relevant part:

> If a party *denies* the genuineness of a document, or the truth of a matter as requested under MCR 2.312, and if the party requesting the admission later proves the genuineness of the document or the truth of the matter, the requesting party may move for an order requiring the other party to pay the expenses incurred in making that proof, including attorney fees. [Emphasis added.]

A trial court is required to enter an order pursuant to MCR 2.313 unless one of the grounds under MCR 2.313(C)(1)-(4) applies. Plaintiff is correct that he did not deny the truth of a matter as requested. Absent a denial, attorney fees were not appropriate under the plain language of MCR 2.313(C). See *Henry v Dow Chem Co*, 484 Mich 483, 495; 772 NW2d 301 (2009) (stating that the first step in interpreting a court rule is "considering the plain language of the court rule in

---

[12] Notably, if Judge Brennan intended the judgment to require plaintiff to pay *all* of defendant's attorney fees, her order, which she entered just a few days after the judgment, requiring him to pay defendant's attorney fees specifically related to his lack of compliance with the court's January 8, 2014 order concerning payment of the mortgage would have been unnecessary and duplicative.

[13] MCR 2.313(A) pertains to attorney fees related to motions and orders compelling discovery. Neither party claims that defendant filed a motion to compel plaintiff to respond to the request to admit.

order to ascertain its meaning."). Cf. *Richardson v Ryder Truck Rental, Inc*, 213 Mich App 447, 457; 540 NW2d 696 (1995).

Alternatively, however, Judge Brennan had the discretion to order attorney fees under the common-law exception explained in *Reed*, 265 Mich App at 164-165. Plaintiff argues that his admission was factually accurate and reasonable based on the amount of support that he provided at various points and the time at which his support increased. The trial court did not make factual findings regarding exactly how much money was spent to support Mareski each year. As a result, it is not clear from the record whether plaintiff was truthful when he said that "most" of the support was derived from the loan and inheritance. See *Merriam-Webster's Collegiate Dictionary* (11th ed) (defining "most" as "greatest in quantity, extent, or degree" or "the majority of"). Nevertheless, even if his statement was technically truthful, it appears from the context of Judge Brennan's opinion that she concluded that plaintiff's admission was unreasonable because it constituted gamesmanship or an attempt to conceal support provided before plaintiff received the loan and inheritance. Such a conclusion is not clearly erroneous, and ordering attorney fees on that basis was not an abuse of discretion. See *Richards*, 310 Mich App 683, 699-700; *Reed*, 265 Mich App at 165.[14]

However, the record fails to demonstrate the necessary link between plaintiff's answer to the request to admit and the amount of attorney fees awarded by Judge Langton. See *Reed*, 265 Mich App at 165-166 (finding an abuse of discretion when even though the "defendant's failure to comply with a discovery order constituted misconduct, [the] plaintiff did not establish what fees she incurred as a result," and the court made "made no finding in that regard or concerning the reasonableness of the fees incurred because of misconduct."). Here, as in *Reed*, Judge Langton failed to determine the amount of fees incurred by defendant as a result of plaintiff's misconduct before she awarded defendant $68,452.60 in attorney fees and $3,965 in costs.[15]

Therefore, the attorney fees and costs awarded constituted an abuse of discretion, and remand is necessary so that the trial court may determine the fees actually incurred as a result of plaintiff's unreasonable conduct. See *id*.

## 2. ATTORNEY FEES RELATED TO RETURNED MORTGAGE PAYMENT

Plaintiff also contends that the additional proceedings related to his payment of the mortgage on the marital home during the divorce proceedings was not a proper basis for awarding attorney fees. We disagree.

Before the judgment of divorce was entered, defendant filed a motion for contempt,

---

[14] Contrary to plaintiff's claim on appeal, there is no indication that Judge Brennan awarded attorney fees based on plaintiff's lack of credibility. She merely cited plaintiff's lack of credibility as one of the rationales cited by defendant in her request for attorney fees.

[15] Judge Langton generally cited defendant's assertion that the answer required additional discovery and depositions, but she did not identify the specific expenses that resulted.

arguing that plaintiff had violated the January 8, 2014 order requiring him to make mortgage payments on the marital home and, as a result, the lender (Quicken Loans) was initiating foreclosure proceedings. Defendant urged the trial court to order plaintiff to prove that payments were current, and she requested attorney fees associated with plaintiff's violation of the order. In response, plaintiff argued that the payments were current regardless of Quicken Loans' records. Although no testimony was recorded on the date scheduled for the evidentiary hearing on defendant's motion, it appears from Judge Langton's September 9, 2015 opinion that one of the payments that plaintiff made pursuant to the January 8, 2014 order was not accepted and was ultimately returned due to an error made by Quicken Loans. Then, when plaintiff received the returned check, he took no action, which resulted in the initiation of foreclosure proceedings. Ultimately, on October 8, 2014, Judge Brennan entered an order requiring plaintiff to pay defendant $11,138.56 within 48 hours and specifying that "[t]his concludes plaintiff's obligation on the mortgage." The trial court further stated, "Counsel for defendant is awarded actual attorney fees & costs in connection with this matter, the amount of which is to be determined at an evidentiary hearing date to be determined."

Judge Langton concluded that even if plaintiff's conduct strictly complied with the January 8, 2014 order, his conduct disregarded the spirit of the order and resulted in additional unnecessary litigation between the parties. Consistent with this conclusion, there is no indication in the record that Judge Brennan made a finding of contempt, as defendant had requested, or that she ordered attorney fees on that basis. Cf. MCL 600.1721; *Taylor v Currie*, 277 Mich App 85, 99-100; 743 NW2d 571, 580 (2007). Nevertheless, even if attorney fees and costs were not awarded for contempt, an award of attorney fees based on a finding that plaintiff acted unreasonably and generated additional costs to the parties by failing to take action despite his knowledge that the payment was returned was not outside the range of principled outcomes. See *Richards*, 310 Mich App at 699-700; *Reed*, 265 Mich App at 164-165. Thus, Judge Brennan's award of attorney fees based on plaintiff's conduct related to the mortgage did not constitute an abuse of discretion.

Once again, however, Judge Langton abused her discretion by making a blanket award of attorney fees and costs without first determining the amount that resulted from plaintiff's unreasonable conduct. Thus, remand for a determination of the expenses resulting from plaintiff's conduct is necessary.[16]

---

[16] Judge Langton expressly limited her opinion so that it was a determination of a reasonable amount of attorney fees to be awarded consistent with Judge Brennan's orders. She did not separately conclude whether attorney fees were warranted on separate or additional grounds. Therefore, even though plaintiff refutes several statements in Judge Langton's September 9, 2015 order, review of additional grounds for an award of attorney fees is not before this Court. Additionally, contrary to plaintiff's characterization of Judge Langton's opinion, the statements that he challenges on appeal were made in the context of deciding the reasonableness of the fees incurred by defendant's attorney, not in the context of presenting alternative grounds for awarding attorney fees in this case. See *Souden v Souden*, 303 Mich App 406, 415; 844 NW2d 151 (2013).

## 3. MISCELLANEOUS CLAIMS

Finally, plaintiff makes several miscellaneous claims regarding attorney fees. All of these claims lack merit.

He argues that the award should be reversed because he was less able to pay for defendant's attorney fees than she was following the judgment of divorce (which, according to plaintiff, was skewed in defendant's favor). Although ability to pay is a relevant consideration under MCR 3.206(C)(2)(a), that rule was not the basis for the award of attorney fees in this case.

Plaintiff also complains that defense counsel's invoices were vague and included instances of "block billing." Likewise, plaintiff claims that he does not understand what certain entries mean. Plaintiff raised similar arguments below, and Judge Langton repeatedly gave plaintiff the opportunity to question defense counsel about any lack of clarity in his billing records. Nevertheless, as previously stated, the trial court must determine on remand which expenses were related to—and were necessary as a result of—plaintiff's response to the request to admit and the mortgage-payment matter. See *Souden v Souden*, 303 Mich App 406, 415; 844 NW2d 151 (2013); *Reed*, 265 Mich App at 164-165; *Stackhouse v Stackhouse*, 193 Mich App 437, 445; 484 NW2d 723 (1992). To the extent that plaintiff remains confused, remand should help to clarify which expenses where tied to the request to admit and the mortgage-payment matter.

## VI. MOTION TO ENFORCE THE JUDGMENT

In Docket No. 330213, plaintiff argues that Judge Langton erred in enforcing Judge Brennan's judgment of divorce. We disagree.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

Divorce actions are equitable in nature, and circuit courts have the authority to make any order to enforce their judgments in divorce cases. MCL 600.611; *Draggoo*, 223 Mich App at 428. As such, the court should use its equitable powers to fashion its relief according to the character of the case and do what is " 'necessary to accord complete equity and to conclude the controversy.' " *Draggoo*, 223 Mich App at 428. "A trial court's decision concerning equitable issues is reviewed de novo, although its findings of fact supporting the decision are reviewed for clear error." *Eller v Metro Indus Contracting, Inc*, 261 Mich App 569, 571; 683 NW2d 242 (2004).

## B. PAYMENT OF REVENUE FROM PENDING CASES[17]

---

[17] In his statement of the questions presented in Docket No. 324555, plaintiff challenges the trial court's division of fees from cases pending in the law firm, but he provides no argument regarding this issue in the body of his brief. Thus, we deem this claim abandoned. See *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999). However, we will address his

-16-

Regarding revenue from pending cases, the judgment of divorce provides:

> 12. Law Firm of Schwartz & Oltarz-Schwartz, P.C. Revenue: Defendant retains her 50% interest in the law firm of Schwartz & Oltarz-Schwartz, P.C. Defendant is awarded a 50% interest in revenue produced in the cases listed on Trial Exhibit R (a copy of which is attached hereto and incorporated herein) as Exhibit A.

The fee agreement for one of the cases listed on Trial Exhibit R ("*Dart*") provided for an hourly fee of $200 per hour as well as a 20 percent contingency fee. The firm billed the client for 277.7 hours, totaling $55,540. The client settled the case for $450,000, resulting in $90,000 to the firm for the contingency fee. Together, the billable hour fees and 20 percent contingency fee provided $145,540 in revenue, half of which is $72,770.[18]

Plaintiff's summary of checks drawn on the firm's account indicates approximately $53,799.68 in withdrawals during the firm's representation of *Dart* (June 2013 through October 2014). Before giving defendant her share of the fees, plaintiff charged her for half of the majority of these expenses (*i.e.*, $25,379.57), so that she received $47,390.43 instead of $72,770. In light of these charges, defendant filed a motion to enforce the judgment, under which she requested the amount deducted by plaintiff for firm-related expenses. Judge Langton ordered plaintiff to pay $25,379.50 to defendant to complete the transfer of 50 percent of the revenue from the *Dart* case, concluding that Judge Brennan's judgment contemplates a "gross theory of distribution," not a net theory that takes into account the costs deducted by plaintiff prior to the distribution.

The thrust of plaintiff's argument on appeal is that Judge Langton's order requiring him to pay $25,379.50 to defendant was inequitable because (1) he performed the vast majority of the work on the case, (2) each party bore responsibility for all of the expenses that the firm incurred during its representation of *Dart*, as no settlement could have been reached otherwise, (3) some of the expenses were for defendant's direct benefit, including payment of her COBRA expenses and her bar dues, and (4) the fees paid in *Dart* should have been reduced in light of these expenses before they were divided between the parties. We disagree that Judge Langton's order was inequitable.[19]

As Judge Langton noted, the divorce judgment does not define the term "revenue."

related argument in Docket No. 330213 concerning the portions of Judge Langton's order involving attorney fees from the *Dart* case.

[18] Some expenses were billed to the client and paid from an IOLTA account, but those amounts are not at issue on appeal.

[19] To the extent that plaintiff again challenges Judge Brennan's property division on the basis that she attributed disproportionate weight to plaintiff's fault, we reject plaintiff's claims for the reasons previously discussed in this opinion. Judge Langton's order merely effectuated Judge Brennan's division of property; it did not add to plaintiff's existing burden.

-17-

Similar to our review of contract interpretation, we review *de novo*, as a question of law, a trial court's interpretation of the terms of a divorce judgment. *Smith v Smith*, 278 Mich App 198, 200; 748 NW2d 258 (2008); *Healing Place at North Oakland Med Ctr v Allstate Ins Co*, 277 Mich App 51, 55; 744 NW2d 174 (2007). Likewise, divorce judgments are generally interpreted in the same manner as contracts. *Smith*, 278 Mich App at 200. Accordingly, terms of a divorce judgment are to be given their plain and ordinary meanings, and a court may consult dictionary definitions in order to determine the plain and ordinary meaning of a term that is undefined in the judgment. See *id.* at 200-201; *Coates v Bastian Bros, Inc*, 276 Mich App 498, 503; 741 NW2d 539 (2007). When the language is unambiguous, it will be construed as written. *Coates*, 276 Mich App at 503. Additionally, however, "[a] judgment of divorce is to be construed in light of the trial court's findings of fact and conclusions of law." *Smith*, 278 Mich App at 200.

"Revenue" is defined as "the total income produced by a given source," or "the gross income received by an investment." *Merriam-Webster's Collegiate Dictionary* (11th ed). "Income" is defined as "a gain or recurrent benefit usu[ally] measured in money that derives from capital or labor; *also*: the amount of such gain received in a period of time." *Id.* These definitions do not contemplate deductions for any expenses, whether related to the source of the income, such as payment for Carl Schwartz's work on *Dart*, or other matters, such as loans to Schwartz for unspecified reasons. Additionally, nothing in the opinion and order, or the divorce judgment, assigns responsibility to either party for the expenses incurred by the law firm during the *Dart* case. Thus, given the plain and ordinary meaning of "revenue," we agree with Judge Langton's conclusion that Judge Brennan intended for the *Dart*-related fees to be divided on a gross basis rather than on a net basis when she entered the judgment of divorce. See *Smith*, 278 Mich App at 200.

Additionally, plaintiff argues that defendant actually should have received less than the $47,390.43 that he already paid her because defendant only was entitled to 50 percent of the contingency fees pursuant to the August 29, 2014 opinion granting the divorce.[20] We disagree.

> As plaintiff emphasizes, the opinion granting a divorce provides:
>
> As to the value of the law firm, Plaintiff testified as to his current contingency fee cases. He argues that his office runs at a deficit and that he broke even this year. (Defendant, a 50% partner in Schwartz & Oltarz-Schwartz, P.C., retains her interest in the firm.) To the extent that any of the cases in Exhibit Q produce revenue in the future, Defendant shall be entitled to her 50% marital portion of those contingency fees.

However, plaintiff fails to recognize that when both parties, following the entry of Judge Brennan's August 29, 2014 opinion, presented documentation of the fee structures for the pending cases with their proposed divorce judgments, they agreed that fees from the *Dart* case originated not only from a 20 percent contingency fee, but also from a $200 billable hour fee. The language of defendant's proposed judgment accounted for the broader fee structure

---

[20] With regard to the *Dart* case, 50 percent of the 20 percent contingency fee is $45,000.

("Defendant is awarded a 50% interest in *revenue* produced in the cases listed on . . . Exhibit A." [Emphasis added.]), while plaintiff's proposed judgment provided a more limited fee structure ("Defendant is awarded a 50% interest in the contingency fee revenue produced in the cases listed on . . . Exhibit A."). Although Judge Brennan did not specifically address this discrepancy at the hearing before she entered the divorce judgment, it is apparent that she adopted defendant's broader language in her final judgment.

Additionally, contrary to plaintiff's claims, this language appears consistent with Judge Brennan's August 29, 2014 opinion, as it states, "To the extent that any of the cases . . . *produce revenue* in the future, Defendant shall be entitled to her 50% marital portion of *those* contingency fees." (Emphasis added.) When read in context, her use of the word "those" appears to suggest that Judge Brennan believed when she entered the opinion—presumably due to both parties' repeated references to "the contingency cases" throughout the trial—that all of the revenue from those cases would be received from contingency fees, and that this belief was later undermined by the documentation submitted by the parties with their proposed judgments. Thus, on this record, we reject defendant's claim that Judge Langton's interpretation of the judgment was in error.

Moreover, plaintiff claims that this result is inequitable because he took "money from his own assets to make such payments . . . , and he loaned money to the firm for that purpose." The only evidence in the record regarding such a loan is plaintiff's own testimony that he withdrew money from his IRA in 2013 and 2014 for expenses associated with the law firm, as well as marital expenses, such as the mortgage. The parties were legally married for the entirety of the firm's 16-month representation in *Dart*, except for eight days. And the IRA was a marital asset until it was awarded to defendant in the judgment of divorce. See *Cunningham*, 289 Mich App at 200-202. Thus, a loan from the IRA would have constituted a contribution by both plaintiff and defendant. By awarding each party 50% of the fees without reducing the award for expenses, plaintiff and defendant were, in effect, each repaid equally for the loan. Therefore, plaintiff's argument is unpersuasive.

Plaintiff argues that the order regarding the *Dart* fees is inequitable because he only received either 21 or 30 percent of the fees, contrary to the order requiring a 50-50 split. As previously mentioned, Judge Langton ruled that each party was entitled to the same amount of fees: $72,770. Any claim that plaintiff was responsible for the firm's expenses during the pendency of *Dart*, and consequently received fewer fees, is refuted by his testimony and argument that the expenses were paid with a loan from the IRA—a marital asset. But even if the expenses were paid exclusively from the firm's account, there is no evidence that the firm's account was anything but a product of the marriage as well.

Lastly, plaintiff argues that it was inequitable for the court not to reduce the *Dart* fees by the firm's expenses because defendant benefitted from some of the payments, including $2,125.04 in COBRA payments for her health care between July 2013 and November 2013 and payment of her bar dues. However, plaintiff also benefited from some of the payments by receiving, *inter alia*, the payment of bar dues, office rent, and receptionist and technology fees so he could continue the practice of law. Therefore, we are unpersuaded by plaintiff's claim.

## C. SPOUSAL SUPPORT

Next, plaintiff raises challenges regarding the life insurance policies that the trial court ordered him to obtain to guarantee payment of spousal support. First, to the extent that plaintiff argues that Judge Brennan's order in the judgment of divorce lacked clarity regarding the requirements for the new insurance policy, Judge Langton later provided clarification when she ordered him to obtain two $50,000 policies from Generation Insurance Company. See *Barbier v Barbier*, 45 Mich App 402, 404; 206 NW2d 464 (1973) ("It is clear that the trial court has the power to clarify and construe a divorce judgment as long as it effectuates no change in the substantive rights of the parties.").

Plaintiff also argues that "the requirement that [he] purchase life insurance policies to insure the continuance of alimony is harsh, punitive, inequitable, and an abuse of discretion" in light of the difficulties that he has encountered in securing coverage due to his age and medical history. Judge Langton acknowledged in her opinion and order that plaintiff experienced difficulties in obtaining a policy, but she ordered coverage that plaintiff had demonstrated he could obtain. At the hearing, defendant's attorney explained that plaintiff had produced an email from Generation Life Insurance indicating that he could purchase a $50,000 policy and a colleague "will get him another fifty." Although defendant's attorney acknowledged on the record that the proceeds from this policy would last less than 10 years if plaintiff's death preceded defendant's death, he requested that Judge Langton order plaintiff to obtain those policies. Therefore, any argument by plaintiff on appeal that this particular coverage would be insufficient under the terms of the judgment, or that it is impossible for him to obtain coverage in compliance with the judgment, is meritless given defendant's agreement to the amount of coverage.

Likewise, plaintiff claims that Judge Langton's order to obtain the two Generation Life Insurance policies is inequitable because the total cost is unaffordable given his current income and expenses. Although plaintiff asserts in his brief on appeal that his monthly obligation would be more than $700 for the policies, plaintiff never offered any evidence to support this claim in the trial court, and he likewise fails to support this claim on appeal. Absent any evidence regarding the cost of the policies, we find no basis for concluding that Judge Langton's order was inequitable.

D. $5,000 WITHDRAWAL

On January 8, 2014, Judge Brennan ordered plaintiff to pay the mortgage, taxes, and insurance for the marital home, but ordered the parties to otherwise "pay their own other expenses until further order." On June 13, 2014, the trial court entered an order adjourning the trial and prohibiting liquidation of the parties' IRAs, "except in the ordinary course of business to maintain the status quo . . . ." In August 2014, plaintiff withdrew $5,000 from his IRA. Later, in her motion to enforce the judgment, defendant claimed that plaintiff improperly removed the $5,000 and requested repayment. Subsequently, in her September 18, 2015 order, Judge Langton ordered plaintiff to reimburse defendant for the $5,000 withdrawn from the IRA. In particular, Judge Langton found plaintiff's explanation regarding the expenditures to be vague and unclear, concluding that she was unable to determine from the evidence presented "where the money was deposited or whether it was used to maintain the status quo of the parties."

On appeal, plaintiff claims that Judge Langton's order is inequitable because his

withdrawal from the IRA was consistent with Judge Brennan's status quo order. We disagree.

Consistent with Judge Langton's findings, our review of the record confirms that plaintiff failed to provide the court with bank statements showing the transfer of $5,000 to an account with debits for subsequent expenses. He only proffered a chart that he created which listed payments to various companies and organizations, without any descriptions of the products or services obtained, that exceeded $5,000 in August and September 2014, and he claimed that the $5,000 from the IRA was used to pay for those expenses. Although plaintiff claims on appeal that some of these expenses were made in the ordinary course of business to maintain the status quo—and were, therefore, consistent with Judge Brennan's order—he did not offer any proof in the trial court, such as invoices or even his own affidavit, that these payments were related to ordinary expenses that he or defendant incurred (as opposed to someone else). See *In re Rudell Estate*, 286 Mich App at 405. Interestingly, plaintiff argues that he made payments on his credit card balances to avoid the destruction of his credit so he could then use the cards for ordinary expenses, but he does not offer proof, or even claim, that those particular credit card expenses were incurred in the ordinary course of business.

Given the trial court's findings regarding plaintiff's history of dissipating marital assets for a third party and his attempts, even at trial, to conceal that spending, we are not convinced that Judge Langton clearly erred in finding that plaintiff failed to substantiate this withdrawal. Absent proof that the $5,000 was withdrawn in the ordinary course of business to maintain the status quo, the order requiring plaintiff to repay $5,000 to defendant was not inequitable.

## VII. ATTORNEY FEES ON APPEAL

Finally, in Docket Nos. 324555, 330031, and 330213, defendant seeks attorney fees, or states an intention to file a motion for attorney fees, upon the conclusion of this appeal. Under MCR 7.216(C)(1), a party may move for actual and punitive damages or other disciplinary action as provided under MCR 7.211(C)(8). Defendant's notations in her briefs on appeal are ineffectual, as they are not a proper substitute for the requisite motion. MCR 2.111(C)(8); *Fette v Peters Const Co*, 310 Mich App 535, 553-554; 871 NW2d 877 (2015).

Pursuant to MCR 7.211(C)(8), defendant may file a motion requesting damages or other disciplinary action "at any time within 21 days after the date of the order or opinion that disposes of the matter that is asserted to have been vexatious." Thus, we deny defendant's current request without prejudice. *Fette*, 310 Mich App at 554.

## VIII. CONCLUSION

In Docket Nos. 324555 and 330031, we affirm the judgment of divorce and the postjudgment order granting in part defendant's motion to enforce the divorce judgment. However, in Docket No. 330213, we vacate Judge Langton's order regarding attorney fees and remand for further proceedings for the reasons stated in this opinion.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Jane E. Markey
/s/ Michael J. Riordan